*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
FEDERAL INSURANCE COMPANY,          :          Civil Action No. 08-2581
                                    :
        Plaintiff,                  :              **OPINION**
                                    :
v.                                  :
                                    :
CHEROKEE ARDELL, L.L.C.,            :
INTERNATIONAL RISK GROUP, L.L.C.,   :
and AMERICAN INTERNATIONAL          :
SPECIALTY LINES INSURANCE           :
COMPANY,                            :
                                    :
        Defendants.                 :
_____:

**WOLFSON, United States District Judge**:

This action arises out of a dispute relating to insurance coverage for an environmental remediation project in Maplewood, New Jersey. Defendant American International Specialty Lines Insurance Company ("AISLIC"), issued two insurance policies to Defendant Cherokee Ardell, L.L.C. ("Cherokee"): a Cleanup Costs Cap Policy ("Cost Cap Policy") and a Pollution Legal Liability Select Policy ("PLL Policy"). Plaintiff, Federal Insurance Company ("Federal"), which was named as an additional insured in both policies, brought this case against Cherokee for breach of contract and against AISLIC for indemnification of various expenses. Cherokee also asserted a cross-claim against AISLIC for indemnification. AISLIC now moves for partial summary judgment claiming that it is not obligated to reimburse Federal or Cherokee under the Cost Cap Policy. In response, Federal cross-moves for partial summary judgment against AISLIC on its claims in connection with the PLL Policy. Cherokee also cross-moves for

summary judgment on its cross-claim with respect to the PLL Policy.[1]  The issues in the motions before the Court concern whether AISLIC is obligated under the policies to pay Federal and Cherokee for their claims for reimbursement and indemnification.

For the reasons that follow, AISLIC's motion for partial summary judgment is granted, and Federal's and Cherokee's motions for partial summary judgment are denied.

## I. BACKGROUND

The following facts are not disputed unless otherwise noted.

This matter arises out of a remedial environmental cleanup of a property located at 238 Burnett Avenue in Maplewood, New Jersey (the "Property" or the "Site"), ordered by the New Jersey Department of Environmental Protection ("NJDEP").  See NJDEP Administrative Consent Order ("ACO"), In Re Ardell Industries, Inc. ECRA Case #88579 (Decl. of Matthew S. Slowinski, Esq. ("Slowinski Decl.") Ex. 3).  The Property had been owned and operated by American Razor Blade Corp. ("ARB") and Ardell Industries, Inc. ("Ardell"), whose usage of volatile chemicals in their commercial grade razor blade manufacturing operations caused environmental damage to the property site.  Id.  In 1989, the Ardell shareholders Howard E. Strauss ("Strauss") and Beherooz Ghavami ("Ghavami") entered into a contract of sale of the Property with Ardell Acquisition Corporation; the contract was assigned to American Safety Razor Company ("ASR"), a company affiliated with Ardell Holdings, Inc.

In April 1989, pursuant to the Environmental Cleanup Responsibility Act ("ECRA") (n/k/a the Industrial Site Recovery Act ("ISRA") (N.J.S.A. 13:1K-6 et seq.)), the NJDEP issued an Administrative Consent Order ("ACO") imposing various remedial and financial assurance

---

[1]    AISLIC filed a sur-reply to the reply letter of Cherokee.  Federal objects to this filing, contending that the sur-reply is simply a rehashing of arguments made previously.  However, the Court finds that AISLIC's sur-reply addresses certain factual issues that were newly asserted in Federal and Cherokee's reply briefs and thus will consider it on these motions.

obligations upon ASR, Ardell and its shareholders to perform the environmental cleanup of the Property.  See NJDEP Administrative Consent Order.  The ACO required Ardell and ASR to implement a NJDEP-approved cleanup plan pursuant to the ECRA.  Id.  The property had been insured by Federal under various general liability and umbrella insurance policies.  Confidential Settlement Agreement and Release (Slowinski Decl. Ex. 4).  In light of the ACO, ASR and Ardell filed insurance claims with Federal for recovery of costs that would be incurred in connection with the investigation and remediation activities.

In or around September 1996, Federal entered into a Settlement Agreement and Release ("1996 Settlement Agreement") with Ardell, ASR, Strauss and Ghavami, the responsible parties under the ACO.  Pursuant to the 1996 Settlement Agreement, Federal assumed responsibility for the remedial environmental cleanup of the contaminated Site.  Confidential Settlement Agreement and Release at ¶¶ 3, 4 (Slowinski Decl. Ex. 4).  In turn, Federal retained the services of Cherokee Environmental Risk Management ("CERM") (n/k/a Defendant International Risk Group, L.L.C. "IRG") to assist in the evaluation and remediation of the Site.  In or around May 1998, Federal and CERM entered into an agreement ("1998 Remediation Agreement") regarding the environmental remediation.  Pursuant to the 1998 Remediation Agreement, CERM established an entity—Defendant Cherokee—to assume responsibility for Federal's cleanup obligations.[2]  1998 Remediation Agreement ¶ 2 (Slowinski Decl. Ex. 5).  Cherokee was also obligated to procure insurance with Defendant AISLIC to protect Federal and CERM from future liability.  Id. at ¶ 3.

---

[2]	For purposes of clarity, the Court will refer to both Defendants IRG/CERM and Cherokee as "Cherokee."

Pursuant to the 1998 Remediation Agreement, Cherokee purchased two separate insurance policies from AISLIC, and Federal was named as an additional insured under both policies.  The policies are:

1.  Cleanup Costs Cap Policy ("Cost Cap Policy") (Policy #CCC2673002) for the period of June 11, 1998 through June 11, 2008 with a $2,000,000 Total All Losses liability limit and a Self-Insured Retention ("SIR") of $766,015.  Cost Cap Policy (Decl. of Michelle K. Carson, Esq. ("Carson Decl.") Ex. 1).  This policy provided that: "[AISLIC] will indemnify the **Insured** for **Loss**[3] which the **Insured** sustained for **Cleanup Costs**[4] the **Insured** first incurs on or after the **Inception Date** [June 11, 1998] and before the **Termination Date** [June 11, 2008] . . ."[5]  Cost Cap Policy § I, Coverage A.  The Policy also gave AISLIC, as the insurer, the right to "review, assess and inspect all aspects of any **Cleanup** to which the policy applies . . . ."  Id. at § V.1.

2.  Pollution Legal Liability Select Policy ("PLL Policy") (Policy #CRE8195249) for the period of June 11, 1998 through June 11, 2008 with a limit of $2,000,000 per incident and aggregate limit of $5,000,000.  PLL Policy (Slowinski Decl. Ex. 8).

In May 1998, Cherokee commenced the environmental remediation project.  In a letter dated May 25, 2001, Cherokee notified AIG Domestic Claims, Inc. ("AIGDC"), AISLIC's authorized insurance representative, that the clean-up costs had reached $764,770.92 and were about to exceed the $766,015.00 SIR.  See Letter from Annette E. Davis, CERM, to Warren

---

[3]     The Policy defines "Loss" as "[r]easonable and necessary costs, charges and expenses expended and paid by the **Insured** in excess of the Self-Insured Retention shown in the Declarations solely for **Cleanup** at the **Covered Location**."  Cost Cap Policy § II.H.

[4]     The Policy defines "Cleanup Costs" as "reasonable and necessary costs, charges and expenses in excess of the **Self-Insured Retention** incurred solely for **Cleanup**."  Cost Cap Policy § II.C.

[5]     The bolded terms are in the original and defined in the Policy.

Puffer, AIG, May 25, 2001 (Slowinski Decl. Ex.9) ("May 25, 2001 Letter").  In response, on December 28, 2001, AIGDC informed Cherokee that it "will accept coverage for this claim under Policy CCC 2673002 [the Cost Cap Policy], subject to the [Policy's] terms and conditions." See Letter from Brian Goldrich, AIG, to Tammi Essmeier, CERM, Dec. 28, 2001 (Slowinski Decl. Ex. 10) ("Dec. 28, 2001 Letter").  AISLIC then exercised its rights under the Cost Cap Policy to "review, assess and inspect all aspects of any **Cleanup** to which the policy applies . . . ."  Cost Cap Policy § V.  To what extent AISLIC exercised these rights and what role AISLIC played in the remediation process is in dispute among the parties.  The parties also disagree as to whether this acceptance was unconditional or constituted a waiver of the Cost Cap Policy's terms and conditions.

By 2006, almost eight years after the project began, the remediation of the Site pursuant to the ACO had not been completed.  The record on this motion reflects that there had been miscommunications and disputes between Cherokee and the NJDEP concerning the specifics of the remediation efforts of the contaminated soil on the Site.  See Letter from Timothy R. Henderson, counsel for ASR, to Donald E. Barb, Chubb Group of Insurance Companies, counsel of Federal, July 20, 2006 (Slowinski Decl. Ex. 13) ("July 20, 2006 Letter").  Furthermore, it appears that there were "a number of failures by [Cherokee] to timely submit requested documents and to perform requested actions in violation of ISRA regulations."  Id.; see also Letter from William J. Friedman, counsel for Strauss, to Donald E. Barb, Aug. 25, 2006 (Slowinski Decl. Ex. 14) ("Aug. 25, 2006 Letter") ("[T]he [NJDEP] has stated . . . that Federal's chosen environmental contractor for the ISRA work, [Cherokee], has not complied with obligations and requirements . . . .").

5

In a letter to Federal dated July 20, 2006, ASR expressed its dissatisfaction with the progress of the remediation project, and referred to pressure being placed on ASR by the NJDEP. See July 20, 2006 Letter.  The letter, referring to the 1996 Settlement Agreement, stated that "Federal has breached its obligations to ASR and that as a consequence, ASR has been damaged and continues to be damaged."  Id. at 3.  On August 25, 2006, ASR's counsel sent Federal's counsel a similar letter claiming that Federal was in breach of the 1996 Settlement Agreement. See Letter from William J. Friedman, counsel for Strauss, to Donald E. Barb, Aug. 25, 2006 (Slowinski Decl. Ex. 14) ("Aug. 25, 2006 Letter").  In turn, Cherokee forwarded these letters to AISLIC and eventually Cherokee submitted a notice of claim to AISLIC based on the potential lawsuit that might be brought by ASR and Ardell against Federal.  See Letter from Nicholas W. Capuano, AIGDC, to Ann Wei, IRG, Dec. 21, 2006 (Slowinski Decl. Ex. 16) ("Dec. 21, 2006 Letter").

In a letter dated December 21, 2006, AIGDC, on behalf of AISLIC, acknowledged receipt of the claim for coverage under the PLL Policy based on ASR's assertions that Federal breached the 1996 Settlement Agreement.  Dec. 21, 2006 Letter.  In this letter, titled "Acceptance of Defense," AISLIC "accepts coverage of this claim under [the PLL Policy] subject to . . . a reservation of rights."  Id.  The letter explicitly referenced Coverage C of the PPL Policy under which AISLIC "agrees to pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims** first made against the **Insured** and reported to [AISLIC] in writing . . . for **Clean-Up Costs** on or under the **Insured Property** . . . ." Id.; see PLL Policy § I.1.C.  The letter also stated that AISLIC "reserves its rights to deny coverage for loss which does not arise out of the definition of Loss" and "does not waive or

surrender any of its rights under any of the terms, conditions, limitations and/or exclusions contained in any of the policies . . . ."  Dec. 21, 2006 Letter.

On August 7, 2007, counsel for ASR sent Federal a draft of a complaint that it proposed to file against Federal, claiming breach of contract, breach of duty of good faith, and violation of two sections of the New Jersey Environmental Rights Act.  See Draft Compl. American Safety Razor Co. v. Federal Ins. Co., Decl. of Steven B. Davis, Esq. Ex. D ("Davis Decl.").  Federal also forwarded the draft complaint to Cherokee and AISLIC; thereafter Federal independently settled with ASR and Ardell.  As a result, ASR has not filed an action against Federal.

On October 12, 2007, AISLIC sent a letter to Federal and Cherokee stating that "we must withdraw our acceptance of your defense," referring to the December 21, 2006 letter.  See Letter from Patrick J. McCreesh, AIGDC, to Ann Wei, IRG, and Steven Jakubowski, Chubb, Oct. 12, 2007 (Slowinski Decl. Ex. 19) ("Oct. 12, 2007 Letter").  AISLIC explained that the claims in ASR's letters, dated July 20, 2006 and August 25, 2006, were not "claims" as defined in the PLL Policy because they fell outside the covered "Loss" pursuant to Coverages C through N of the PLL Policy.  Id.; see PLL Policy § VI.F.

On October 18, 2007, Federal terminated the 1998 Remediation Agreement with Cherokee and retained the services of Shaw Environmental Corp. ("Shaw") to take over the remediation project.  By June 11, 2008, the termination date of the Cost Cap Policy, Federal was still incurring expenses as part of the remediation process.  In June 2008, Federal brought this lawsuit seeking indemnification for expenses under the Cost Cap and PLL Policies, and also asserted claims against Cherokee.  On June 24, 2008, AIGDC denied a claim made by Cherokee on June 10, 2008, for the defense and indemnity of Cherokee in this lawsuit.  See Letter from Patrick J. McCreesh, AIGDC, to Ann Wei, IRG, June 24, 2008 (Slowinski Decl. Ex. 20).

In this case, Federal alleges that Cherokee breached the 1998 Remediation Agreement, and it seeks damages in the regard.  As to AISLIC, Federal alleges that AISLIC is obligated under the Cost Cap and PLL Policies to pay for various Cleanup Costs expended as part of the remediation work.  Cherokee has brought a cross-claim against AISLIC, also alleging that AISLIC is obligated under the Policies to indemnify it for various Cleanup Costs and also legal fees in defending against Federal's claims.

Specifically, under the Cost Cap Policy, Federal and Cherokee seek indemnification in the amount of $928,103.99 for expenses incurred from June 11, 2008 through June 3, 2009.  To date, AISLIC has reimbursed Cherokee a total of $594,375 under the Cost Cap Policy for costs that had been reportedly expended and paid within the Policy period (June 11, 1998 through June 11, 2008).  AISLIC has not issued reimbursements for claims of expenses AISLIC alleges were incurred after the Termination Date of June 11, 2008, i.e. $928,103.99.

Moreover, under the PLL Policy, Federal seeks indemnification for expenses related to the claims made by ASR.  By the time of the filing, AISLIC had not issued any reimbursement payments under the PLL Policy.

AISLIC moves for partial summary judgment claiming that it is not obligated to indemnify any party for any further expenses under the Cost Cap Policy.  Federal has cross-moved for partial summary judgment on its claims against AISLIC under the PLL Policy; Cherokee has cross-moved for partial summary judgment on its cross-claim against AISLIC under the PLL Policy.

## II.  STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to

judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Monroe, 536 F.3d at 206 (quoting Matsushita, 475 U.S. at 586).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. S.E.C. v. Antar, 44 Fed. Appx. 548, 554 (3d Cir. 2002).

## III. DISCUSSION

### A. THE COST CAP POLICY

Federal and Cherokee seek indemnification under Coverage A of the Cost Cap Policy for $928,103.99 in expenses as part of the environmental remediation project between June 11, 2008 and June 3, 2009. Defendant AISLIC moves for partial summary judgment on those claims arguing that, under the language of the Cost Cap Policy, AISLIC is not required to indemnify these parties for any Clean-Up Costs expended, paid for, and/or reported to AISLIC after the Policy's termination date of June 11, 2008.

The relevant language of the Cost Cap Policy which accounts for the dispute among the parties is as follows:

> [AISLIC] will indemnify the **Insured** for **Loss** which the **Insured** sustained for **Cleanup Costs** the **Insured** first incurs on or after the **Inception Date** [June 11, 1998] and before the **Termination Date** [June 11, 2008]
> . . .
> This Coverage applies only if the following conditions are satisfied:
> . . .
> 2.      The **Insured** reports **Cleanup Costs** to the Company prior to the **Termination Date**, in accordance with Section V.(4)

Cost Cap Policy § I.  The term "Loss" is defined under the Policy as "[r]easonable and necessary costs, charges and expenses expended and paid by the **Insured** in excess of the Self-Insured Retention shown in the Declarations solely for **Cleanup** at the **Covered Location**."  Cost Cap Policy § II.H.  The term "Cleanup Costs" is defined under the Policy as "reasonable and necessary costs, charges and expenses in excess of the **Self-Insured Retention** incurred solely for **Cleanup**."  Cost Cap Policy § II.C.

Insurance policies are contracts of adhesion and, as such, are subject to special rules of interpretation.  Gibson v. Callaghan, 158 N.J. 662, 671 (1999); Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537 (1990); see also Allen v. Metropolitan Life Insurance Co., 44 N.J. 294, 305 (1965) (noting that since an insurance company is an expert in its field, ambiguous policy terms are often construed in favor of the insured); Jones v. Continental Cas. Co., 123 N.J. Super. 353, 360 (Ch. Div. 1973).  Generally, the words of an insurance policy are to be given their plain, ordinary meaning. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001); Longobardi, 121 N.J. at 537; see also Sinopoli v. North River Ins. Co., 244 N.J. Super. 245, 251 (App. Div. 1990) ("[A] court [is not] permitted, even under the guise of good faith and peculiar circumstances, to alter the terms of an otherwise unambiguous contract.").  Courts should interpret policy terms that are clear as they are written without injecting ambiguity and "avoid writing a better insurance policy than the one purchased."  President v. Jenkins, 180 N.J. 550, 562 (2004); Hardy v. Abdul-Matin, 198 N.J. 95, 101-02 (2009); Longobardi, 121 N.J. at 537.

A "genuine ambiguity" exists only "where the phrasing of the policy is so confusing that the average policy holder cannot make out the boundaries of coverage."  Botti v. CNA Ins. Co., 361 N.J. Super. 217, 224 (App. Div. 2003) (quoting Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247 (1979)).  When a contract contains ambiguous language and yields two interpretations,

the ambiguities should be resolved in favor of the insured.  <u>Rothschild v. Foremost Ins. Co.</u>, 653 F. Supp. 2d 526, 532 (D.N.J. 2009); <u>Gibson v. Callaghan</u>, 158 N.J. 662, 670-71 (1999); <u>see also Allen</u>, 44 N.J. at 305.  Overall, courts will generally construe terms in favor of coverage "to the full extent that any fair interpretation will allow." <u>Kievit v. Loyal Protective Life Ins. Co.</u>, 34 N.J. 475, 482 (1961) (citation and quotations omitted).  When construing an ambiguous term in an insurance policy, courts should consider whether more precise language by the insurer—had such language been included in the policy—"would have put the matter beyond reasonable question." <u>Doto v. Russo</u>, 140 N.J. 544, 557 (1995).

The dispute over the Cost Cap Policy language concerns an interpretation of the term "first incurs" found in Coverage A.  Under AISLIC's interpretation, in order for costs to be covered, environmental remediation expenses must be incurred, expended, paid for and reported before the Termination Date.  In other words, AISLIC maintains that the specific remediation activity and expenditures for which the insured would seek reimbursement must have fully taken place before the Termination Date.  AISLIC further argues that allowing costs to be covered outside the Policy Period would render the Loss definition meaningless because "Loss" is defined as those costs actually expended and paid for, and Coverage A only covers Loss expended within the Policy Period.  AISLIC reasons that since the Policy defines "Loss" as those expenses "expended and paid," Federal and/or Cherokee must have actually expended and paid for Cleanup Costs before the Termination Date in order for those costs to be covered.  <u>See</u> Cost Cap Policy § II.H.  Therefore, AISLIC argues that the costs amounting to $928,103.99 that Federal and/or Cherokee expended and paid for after June 11, 2008, are not covered by Coverage A.  AISLIC additionally argues that Federal and/or Cherokee failed to satisfy Coverage A's

condition that Cleanup Costs be reported prior to the Termination Date, June 11, 2008.  Id. § I.A.2.

On the other hand, Federal and Cherokee interpret the Cost Cap Policy language broadly. They argue that AISLIC has a "continuing duty" to indemnify for costs that were "first incurred" before the Termination Date, even if the costs were expended and paid after that date. Under their reading, the term "first incurs" refers to the moment when the insured parties first became liable for any remediation costs and expenses during the policy period.  In essence, Federal and Cherokee contend that AISLIC would be accountable for all expenses for which the insured became liable within the Policy period, regardless whether the work was undertaken or expenses were paid after the Termination Date of the policy.  Federal and Cherokee argue that while, concededly, the expenses of $928,103.99 for which they seek indemnification were actually paid after the Termination Date, these costs were related to the remediation work that began before the Termination Date; as such, these costs were "incurred" within the Policy period.  Federal and Cherokee contend that this reading is necessary in order to give meaning to the term "first incurs."  They note that the operative word used in Coverage A is "incurs" rather than "pays" or "expends," and argue that a precise reading of the word "incur" does not require that the insured actually pay for the costs and expenses, but rather that they only become liable to pay for them. Federal and Cherokee also argue that the Cost Cap Policy is a traditional claims-made insurance policy, under which the policy payment obligation is "triggered" by the insured's claim for coverage rather than the insured parties' payment of expenses.  At the least, Federal and Cherokee argue, the ambiguity over the "first incurs" language presents a triable issue of fact.

The Court rejects Federal and Cherokee's reading of the Cost Cap Policy provision as an unreasonable extension of coverage and contrary to the policy's plain and unambiguous

language.  Under Federal and Cherokee's reading, AISLIC would be liable for all cleanup costs associated with the remediation project, regardless when those costs were incurred or paid. Federal and Cherokee's interpretation would require AISLIC to cover expenses connected to remediation work done after the Termination Date, so long as that work was remotely related to any remediation work commenced within the Policy period.  This Court disagrees.  Rather, the Court finds that the Cost Cap Policy's language is unambiguous and supports the position taken by AISLIC.

Reading the Coverage A language as a whole and in conjunction with the definition of the term "Loss," it is clear that the Cost Cap Policy covered only those expenses which Federal and Cherokee incurred, expended, paid for and reported within the Policy period.  "Loss" is clearly defined in the Cost Cap Policy as those "costs, charges and expenses expended and paid" by the insured parties.  Cost Cap Policy §§ I.A, II.H (Coverage A holds AISLIC responsible for the indemnification of "**Loss** [costs, charges and expenses expended and paid by the **Insured**] which the Insured sustained for **Cleanup Costs** the **Insured** first incurs on or after the **Inception Date** and before the **Termination Date** . . .").  In that regard, it is clear that the Cost Cap Policy was only intended to cover expenses in excess of the SIR <u>within the fixed policy period</u>.  Any costs associated with the remediation work done outside the period are simply not covered by the plain language of the Policy.[6]  In fact, Federal and Cherokee's interpretation—that they could claim indemnification for costs they have incurred but not yet expended or paid—ignores the presence of the term "Loss" as used in Coverage A and renders it meaningless.  <u>See</u> <u>J. Josephson,</u>

---

[6]     The Court notes that Federal's own Senior Environmental Claims Examiner in charge of the subject claim, Megan Trend—a lawyer who had previously worked for AISLIC's pollution insurance products unit—interprets the Coverage A language in the same way.  In response to a question of whether the relevant Coverage A language "covered costs after the termination date," Trend responded, "No."  Trend Dep. 62:13-63:17 (Davis Decl. Ex. F).

Inc. v. Crum & Forster Ins. Co., 293 N.J. Super. 170, 216 (App. Div. 1996) ("[A]n insurance contract must be interpreted by considering the agreement as a whole, and whenever possible, meaning must be given to all of its parts."); see also Air Master Sales Co. v. Northbridge Park Co-Op, Inc., 748 F. Supp. 1110 (D.N.J. 1990) ("[A] general policy of contract law requires that the contract be construed as a whole whenever possible."); Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1131 (3d Cir. 1969) ("A contract must be construed as a whole and wherever possible, effect will be given to all its parts.").

The Court also rejects Federal and Cherokee's suggestion that this reading would render the "first incurs" language meaningless.  Given the definition and presence of the term "Loss," "first incurs" is given meaning in that the term excludes from Coverage A expenses that may have been first incurred before the Inception Date, but were paid for, expended and reported within the Policy period.  For example, consider the following possible scenario: Federal and Cherokee commenced remediation work before the Inception Date, thus incurring various cleanup costs, but expended, paid and reported the expenses during the Policy period.  The expenses in such a situation would not fall under the policy coverage because Coverage A only requires AISLIC to indemnify for expenses "first incurred" within the Policy period.

Federal and Cherokee also argue that AISLIC's interpretation of Coverage A amounts to a "race against the clock" situation whereby the insured parties would have to pre-pay for remediation work performed close to the Termination Date, but that they anticipated would be completed after the Termination Date.  The Court also rejects this argument.  A plain reading of the Cost Cap Policy and its ten-year period of coverage shows that the parties agreed that the policy would cover only those expenses which Federal and Cherokee incurred within that coverage period, i.e. expended, paid and reported.  It is apparent that Federal and/or Cherokee

failed to complete the remediation project within the ten-year period and thus incurred various costs after the Termination Date in order to fulfill their contractual obligations.  Now, Federal and Cherokee seek indemnification for these additional costs which are not covered by the plain language of Coverage A.  It is not for the Court to draft a better insurance contract that would indemnify Federal and Cherokee for their expenses after the Termination Date.[7]  See Jenkins, 180 N.J. at 562 (2004); Hardy, 198 N.J. at 101 (2009); Longobardi, 121 N.J. at 537.  Indeed, adopting Federal and Cherokee's reading would allow for coverage of all remediation costs expended after the Termination Date; this would in fact render the policy period and its Termination Date ineffective and meaningless.

## 1. ESTOPPEL

Even if the expenses were first incurred after the Termination Date, Federal and Cherokee contend that there remains a triable issue of fact as to whether AISLIC should be estopped from denying coverage.

Under the equitable doctrine of estoppel, an insurance carrier may be estopped from denying coverage "despite a clear contractual provision excluding the claim from the coverage of the policy."  Griggs v. Bertram, 88 N.J. 347, 355-56 (1982).  Most frequently, estoppel is applied in situations where an insurer undertakes to defend a lawsuit based on a claim against the insured party.  Id.; see Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 127-129 (1962); Sussex Mutual Ins. Co. v. Hala Cleaners, Inc., 75 N.J. 117, 125 (1977).  This reasoning has been applied to situations where the insurer has assumed control of a potential lawsuit before a complaint is filed.  See Sneed v. Concord Ins. Co., 98 N.J. Super. 306, 320 (App. Div. 1967); Hanover Ins.

---

[7]     Indeed, contrary to Federal's description, the Cost Cap Policy was not a tradition claims-made policy.  Rather, the policy was a negotiated manuscript policy.  Sur-Rep. Br. of Def. AISLIC at 3-4.

Group v. Cameron, 122 N.J. Super. 51, 65-66 (Ch. Div. 1973). The material issue in cases like these—in determining whether to apply estoppel—is whether and to what extent the insurer assumed control of the situation or preparation of the case or defense such that the insured party is "effectively precluded from acting in its own interest under the policy." Griggs, 88 N.J. at 356-57. If so, then the insurer is estopped from later asserting that it has no responsibility to protect the insured under the policy, even if the claim indeed would fall outside the policy. Id. at 357. The rationale behind estoppel is that the actions of the insurer caused the insured party to justifiably rely on the insurer to "protect it under its policy and to be responsible for any judgment against it." Id. at 356; see also Eggleston, 37 N.J. at 127. Such reasonable reliance would make it inherently inequitable for the insurer to deny coverage of a claim related to the subject to the lawsuit. Griggs, at 356.

The principle of equitable estoppel has also been applied in instances other than the insurer's control of a case or preparation of a defense in a potential litigation on behalf of the insured party. In finding equitable estoppel applicable on an insurance contract dispute, the New Jersey Supreme Court has explained that such cases

> all proceed on the thesis that where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. . . . By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere. . . . If the insurer is saddled with coverage it may not have intended or desired, it is of its own making, because of its responsibility for the acts and representations of its employees and agents.

Harr v. Allstate Ins., Co., 54 N.J. 287, 306-07 (1969) (citations omitted). Based on this principle, courts have found the following elements necessary for equitable estoppel: (1) a misrepresentation as to the fact or extent of coverage, innocent or otherwise, or (2) a reasonable

reliance by the insured thereon to his ultimate detriment.   See Countryside Oil Co., Inc. v.
Travelers Ins. Co., 928 F. Supp. 474, 481 (D.N.J. 1995) (citing Martinez v. John Hancock Mut.
Life Ins. Co., 145 N.J. Super. 301, 313-14 (App. Div. 1976)).   The determination of whether to
apply the doctrine of estoppel has been based on the "degree of invasion of the insured's rights."
Sneed, 98 N.J. Super at 319; Griggs, 88 N.J. at 359.[8]

Federal and Cherokee contend that after agreeing to provide coverage in 2001, AISLIC
substantially controlled and mishandled the remediation project.   Def. Cherokee's Ans. To
Interrog. No. 6 (Slowinski Decl. Ex. 7) ("AISLIC took control and managed remedial activities
at the Site to the detriment of Cherokee Ardell . . . arrogated to itself the management of the
claim on a unilateral basis . . . [and] made it clear that they were controlling all decisions with
respect to the Site."); e-mail from Tammy Essmeier, CERM, to Nick Capuano and Anthony
Vinci, AIG (Supplemental Decl. of Matthew S. Slowinski, Esq. Ex. C); Memo from Tammy
Essmeier, "Cherokee Ardell Site Claim Management by AIG," May 2, 2003 (Supplemental Decl.
of Matthew S. Slowinski, Esq. Ex. C).   Federal and Cherokee argue that their reasonable reliance
on AISLIC's control over the project had the detrimental effect of incurring additional costs and
expenses outside the policy period.   In that regard, Federal and Cherokee contend that after
taking control of the project, AISLIC delayed in reviewing and approving proposals for the
cleanup and delayed in issuing payments on the invoices, which "resulted in the failure of
[Cherokee] to timely and efficiently clean up the Site to the satisfaction of the NJDEP."   Def.
Cherokee's Ans. to Interrog. No. 6.   Cherokee provides documentary support that AISLIC

---

[8]      The insured party (in this case, Plaintiff Federal and Defendant Cherokee) has the burden
of proving equitable estoppel.  Harr, 54 N.J. at 307; United States v. Asmar, 827 F.2d 907, 912
(3d Cir. 1987); Messa v. Omaha Property & Cas. Ins. Co., 122 F. Supp. 2d 523, 532 (D.N.J.
2000); Brookville Mining Equip. Corp. v. Selective Ins. Co. of America, 74 F. Supp. 2d 477,
481 (W.D. Pa. 1999).

delayed in issuing payment on an invoice to one of the environmental consultants, EarthTech. See Supplemental Decl. of Matthew S. Slowinski, Esq. Ex. C, D.  As such, Federal and Cherokee assert that even if payments did indeed fall outside the policy period and would otherwise not be covered by the policy, AISLIC should be estopped from denying coverage because its actions were the cause of such a delay.  At the least, Federal and Cherokee argue, whether these actions are sufficient for the application of estoppel is a material question of fact.  Essentially, Federal and Cherokee argue that their reliance on AISLIC's control over the remediation project prevented them from ensuring that all Cleanup Costs would be incurred within the policy period. AISLIC disputes Federal and Cherokee's assertion that it took substantial control over the remediation project.

Estoppel is typically comprised of the elements of misrepresentation or reasonable reliance.  See Countryside Oil Co Ins. Co., 928 F. Supp. at 481.  Federal and Cherokee do not argue that AISLIC misrepresented the scope of the Cost Cap Policy coverage.  Federal and Cherokee appear to argue that they detrimentally relied on AISLIC's 2001 acceptance of coverage and its control over the remediation project, which included direct payments to environmental consultants, subcontracts and other vendors.  This argument is without merit. First, the claim of reliance on AISLIC's acceptance of coverage in 2001 is in fact an argument of waiver, which this Court will discuss, infra Part III.A.2.  Second, with regards to the question of AISLIC's control over the project, whether AISLIC may have made direct payments for remediation work is unrelated to Federal or Cherokee's alleged reliance that AISLIC would cover expenses that would otherwise fall outside the Policy period.[9]

---

[9]      Federal and Cherokee suggest that AISLIC's exercise of control over the remediation project was not in good faith and caused the remediation work to extend beyond the Policy period.  However, Federal and Cherokee raise these claims in the context of waiver and estoppel

Indeed, courts in this jurisdiction typically apply estoppel in two situations: where the insured party files a claim and the insurer takes an unreasonably long time to investigate and subsequently deny the claim; and where the insurer begins to undertakes to defend the insurer against a third-party claim and then withdraws from the defense on the grounds that the claim falls outside the coverage.  See, e.g., Griggs, 88 N.J. at 355-56; Eggleston, 37 N.J. at 127. Federal and Cherokee claim that AISLIC should be estopped from denying coverage based on AISLIC's alleged control over the remediation project.  However, this is not a situation where AISLIC accepted and then subsequently denied coverage, nor is it one where AISLIC look an unreasonably long time in investigating and denying claims.  AISLIC accepted coverage, and during the term of the policy paid $594,375 in costs.  AISLIC's subsequent control over the remediation project, to whatever extent, was pursuant to its rights under the Cost Cap Policy. See Cost Cap Policy § V.  While Federal and Cherokee disagree with the way AISLIC handled the control over the remediation, this disagreement does not constitute reasonable reliance for the purposes of estoppel.  Any argument challenging AISLIC's exercise of its contractual rights over the remediation project would only be applicable in a contractual context, not one grounded in equity.  Indeed, AISLIC does not cite any authority that has applied the principle of equitable estoppel in such a situation as the one here; nor has the Court found any case applying estoppel to facts similar to these.

Accordingly, the Court finds that the application of estoppel would be inappropriate and thus rejects Federal and Cherokee's estoppel argument.

---

and have not brought a separate claim alleging that AISLIC breached an implied contractual duty of good faith and fair dealing.

## 2. WAIVER

In addition, Federal and Cherokee argue that AISLIC's 2001 acceptance of coverage for the Cleanup Costs exceeding the SIR, and AISLIC's direct payments to vendors and subcontractors for work on the remediation project constituted a waiver of the right to subsequently deny coverage.

Like estoppel, where waiver is applicable, an insurer can be held liable to indemnify for costs that fall outside policy coverage.  Waiver involves the "intentional relinquishment of a known right," and therefore the party alleging wavier must show that the adverse party "knew of his or her legal rights and deliberately intended to relinquish them."  Shebar v. Sanyo Business Sys. Corp., 111 N.J. 276, 291 (1988); Hatco Corp. v. W.R. Grace & Co.-Conn., 801 F. Supp. 1334, 1363 (D.N.J. 1992); Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 15 F. Supp. 2d 561, 565 (D.N.J. 1998).  In other words, "it must affirmatively appear that the party charged with waiver knew his rights and deliberately` intended to relinquish them."  State v. Morgenstein, 147 N.J. Super. 234, 238 (App. Div. 1977).  Based on waiver, an insurer may be liable for a loss for which it would otherwise not be liable according to the terms of the insurance contract.  See Bruni v. Prudential Ins. Co. of America, 100 N.J. Super 154, 159 (App. Div. 1967) (Carton, J. dissenting) (finding a question of material fact as to whether the actions of the insurer constituted a waiver that would bar the insurer from denying coverage based on the fact that the claim would otherwise fall outside the policy), rev'd, 51 N.J. 408 (1968) (adopting the opinion of the dissent below).  Questions of waiver "are usually questions of intent, which are factual determinations that should not be made on a motion for summary judgment."  Shebar, 111 N.J. at 291; Gillman v. Waters, McPherson, McNeill, P.C., 271 F.3d 131, 140 (3d Cir. 2001); Columbia

Sav. & Loan v. Easterlin, 191 N.J. Super. 327, 343 (Ch. Div. 1983), aff'd, Columbia Sav. & Loan v. Bogusz, 198 N.J. Super. 174 (App. Div. 1985).

Hatco, a case particularly on point, involved a facility subject to an NJDEP order for environmental cleanup and remediation pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended, 42 U.S.C. § 9601 et seq.). 801 F. Supp. at 1342-43. The facility's former owner, claiming its insurer was responsible for costs associated with the environmental remediation, sought summary judgment that the insurer waived all defenses to coverage in a letter acknowledging receipt of the former owner's notice of claim against the policy. Id. at 1363. In denying the summary judgment motion, the court pointed to the insurer's express reservation of its rights to deny coverage if the claims were determined to fall outside the policy's coverage. Id. That letter contained the following provision: "'This reservation of rights letter does not waive any other rights or privileges the Continental Casualty Company has under its contract of insurance.'" Id. The Hatco court found that this express reservation of rights showed a lack of an "intentional relinquishment of a known right," a requirement for waiver. Id. (quoting Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291 (1988)).[10]

Here, in the Dec. 28, 2001 Letter, written in response to CERM's May 25, 2001 notification that the Cleanup Costs were about to exceed the SIR, AISLIC wrote that it would cover subsequent Cleanup Costs in excess of the SIR, subject to the terms and conditions of the Cost Cap Policy. Over time, AISLIC indeed paid $594,375 in Cleanup Cost expenses directly to

---

[10]     With regards to estoppel, the Hatco court also noted that because the insurer expressly reserved its rights to deny coverage, a belief held by the former owner that the insurer unconditionally accepted coverage would be "unreasonable" which would negate prejudice, "'an essential element' of estoppel." 801 F. Supp. 1334, 1363 (D.N.J. 1992) (quoting Eggleston, 37 N.J. at 129).

vendors and subcontractors working on the environmental remediation.  Omnibus Resp. and Reply of Chartis Specialty Insurance Company [AILSIC]—Compilation of Statements of Material Facts in Supp. of, in Opp'n and Reply to, Summ. J. Mot. § II.16.  Federal and Cherokee contend that in covering these expenses, AISLIC did not require that Federal or Cherokee show that they had actually expended such costs.  In that regard, Federal and Cherokee conclude that when AISLIC approved coverage in the Dec. 28, 2001 Letter, exercised its right to take control of the remediation project under § V of the Cost Cap Policy, and paid $594,375 in expenses, it waived its right to subsequently deny coverage of the remediation expenses in excess of the SIR—even after the termination of the policy period.

This Court disagrees.  In the Dec. 28, 2001 Letter, AISLIC wrote that it

> does not waive or surrender any of its rights under any of the terms, conditions, limitations and/or exclusions contained in any of the policies issued by AISLIC to Cherokee Ardell, LLC.  AISLIC specifically reserves the right to assert a defense to coverage based on any term, condition, provision or exclusion of the policies issued to Cherokee Ardell, LLC.

Dec. 28, 2001 Letter 2-3.  Because the Letter contained an express reservation of rights, it is clear that AISLIC did not intend to relinquish its right to deny coverage.  Cf. Shebar, 111 N.J. at 291; Hatco, 801 F. Supp. at 1342-43, 1363 (D.N.J. 1992).  When AISLIC accepted coverage in the Dec. 28, 2001 Letter, it did not waive its right to subsequently deny coverage for claims that were excluded by the terms of the Cost Cap Policy; to the contrary, it expressly reserved its right to later deny coverage of claims that would fall outside the policy.

## B.  THE PLL POLICY

### 1.    COVERAGE

Federal and Cherokee have cross-moved for summary judgment arguing that AISLIC is obligated under the PLL Policy to indemnify them for any and all Clean-Up Costs that arise from

third-party claims.[11]   Specifically, Federal and Cherokee assert that claims brought by ASR, Strauss and Ghavami in 2006 gave rise to Loss[12] and Clean-Up Costs[13] for the remediation project.   In the alternative, Federal and Cherokee argue that AISLIC's alleged acceptance of coverage under the PLL Policy estops the insurer from denying coverage or constitutes a waiver of defense.

The following is the relevant language of the PLL Policy which is found in Coverage C, entitled "Third Party Claims For On-Site Clean-Up Of Pre-Existing Conditions":

> [AISLIC] agrees to pay **Loss** on behalf of the **Insured** that the **Insured** becomes legally obligated to pay as a result of **Claims**[14] first made against the **Insured** and reported to the Company in writing during the **Policy Period** [June 11, 1998 – June 11, 2008] . . . for **Clean-Up Costs** on or under the **Insured Property** resulting from **On-Site Pollution Conditions**, provided:
> 1. Such **On-Site Pollution Conditions** commenced prior the **Continuity Date**; and
> 2. The **Clean-Up Costs** are unexpected and unintended from the standpoint of the **Insured**

PLL Policy § I.1.C.

As explained above, in July and August of 2006, ASR expressed to Federal dissatisfaction with the pace and progress of the remediation project, especially in light of

---

[11]    Generally, Coverages C through N of the PLL Policy concern Loss on behalf of the Insured parties that arises from claims for Clean-Up Costs brought by third-parties.  See PLL Policy § I.1.C-N.

[12]    The PLL Policy defines "Loss" as "(1) monetary awards or settlements of compensatory damages for **Bodily Injury** or **Property Damage**; (2) costs, charges and expenses incurred in the defense, investigation or adjustment of **Claims** for such compensatory damages or for **Clean-Up costs**; or (3) **Clean-Up Costs**."  PLL Policy § VI.R.

[13]    The PLL Policy defines "Clean-Up Costs," with respect to Coverages C through N, as "costs and expenses of investigation or removal of, or rendering non-hazardous or less hazardous, **Pollution Conditions** or **Pollution Releases** . . . [t]o the extent required by **Environmental Laws**, or by governmental or court order or directive, or required or approved by a governmental agency, acting under authority granted by **Environmental Laws**."  PLL Policy § VI.G.

[14]    "**Claim** means a written demand received by the **Insured** seeking a remedy and alleging liability or responsibility on the part of the **Insured** for **Loss** under Coverages C through N." PLL Policy § VI.F.

pressure being imposed on ASR by the NJDEP and ASR shareholders.  See July 20, 2006 Letter; Aug. 25, 2006 Letter.  ASR alleged that Federal was in breach of the 1996 Settlement Agreement under which Federal agreed to assume responsibility for the environmental remediation pursuant to the ACO issued by the NJDEP to ASR and its shareholders.  Id.  Cherokee and Federal forwarded these letters to AISLIC and sought coverage for any costs and liabilities to third-parties that have or may result from ASR's breach of contract allegations.  See Dec. 21, 2006 Letter.  In the December 21, 2006 Letter, AISLIC "accepted coverage of this claim under [the PLL Policy] subject to . . . a reservation of rights."  Id.  In August 2007, ASR sent Federal a draft complaint alleging that Federal breached the 1996 Settlement Agreement, breached a duty of good faith, and violated two sections of the New Jersey Environmental Rights Act.  See Draft Compl., Davis Decl. Ex. D.  Federal forwarded the draft complaint to Cherokee and AISLIC, and thereafter Federal independently settled the dispute with ASR.  On October 12, 2007, AISLIC sent a letter to Federal denying PLL Policy coverage for costs incurred based on a third-party claim on the grounds that the alleged Clean-Up Costs and other expenses fell outside the coverage afforded by the Policy.  See Oct. 12, 2007 Letter.

Federal and Cherokee argue that ASR's allegation that Federal was in breach of the 1996 Settlement Agreement gave rise to various additional Clean-Up Costs, which are subject to indemnification under Coverage C of the PLL Policy.  They reason that the ASR "claims" directly obligated them to incur additional costs related to performing further environmental remediation in order to comply with the ACO and ECRA.  Federal and Cherokee contend that these additional costs, albeit unspecified, fall under Coverage C indemnification.  Further, they contend that, in forwarding the July 20 and August 25, 2006 Letters as well as the 2007 Draft

Complaint to AISLIC, the insureds filed the claims for indemnification in a timely fashion, pursuant to the PLL Policy.[15]

In response, AISLIC argues that any costs associated with the ASR claims do not fall under the PLL Policy coverage; AISLIC points to conditions which must be met in order for indemnification under Coverage C to be triggered.  First, AISLIC contends that the Clean-Up Costs were not "unexpected and unintended" from the standpoint of Cherokee and Federal.  See PLL Policy § I.1.C.1.  AISLIC also argues that the ASR claims did not give rise to a legal obligation to incur additional Cleanup Costs, but rather Federal and Cherokee's obligation was merely contractual.  In that connection, AISLIC contends that Federal and Cherokee have failed to show that they are directly required by environmental laws or governmental directives to become obligated to incur such costs.  See PLL Policy VI.G.(2).b.

In coverage disputes, the insured party has the burden of showing that insurance coverage has been triggered.  Wurst v. State Farm Fire and Cas. Co., 431 F. Supp. 2d 501, 504 (D.N.J. 2006); State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) ("[I]n insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does."); Scottsdale Ins. Co. v. City of Easton, 379 Fed. Appx. 139, 143 (3d. Cir. 2010); Hartford Accident & Indem. Co. v. Aetna Life & Cas.

---

[15]    While the PLL Policy initially excluded from coverage costs and loss arising from contractual obligations to third parties (PLL Policy § IV.1.B.), the "Contractual Cut Through" amendment provision exempts from exclusion the 1998 Remediation Agreement between Federal and Cherokee.  PLL Policy, Endorsement #16.  Cherokee and Federal contend, and AISLIC does not dispute, that in light of Endorsement #16 the PLL Policy covers claims that would arise out of the 1998 Remediation Agreement, under which Cherokee and/or CERM assumed Federal's responsibilities for environmental remediation of the Site from the 1996 Settlement Agreement between Federal and ASR.

Ins. Co., 98 N.J. 18, 26 (1984) (insurer bears the burden of proving that an incident falls within an exclusionary provision of a policy; insured bears the burden of proving coverage under a policy). This is especially true in an instance, like the one before this Court, where the insured party is moving for summary judgment on an insurance claim. Wurst, 431 F. Supp. 2d at 503-04; see also Callo v. Allstate Ins. Co., No. L-3495-07, 2010 WL 4923031, at *5 (N.J. Super. App. Div. 2010); cf. Celotex, 477 U.S. at 323.

Under Coverage C, Clean-up Costs are compensable if they are "required by **Environmental Laws** or by governmental or court order or directive, or required or approved by a governmental agency, acting under authority granted by **Environmental Laws**." PLL Policy § VI.G. On this motion, Federal and Cherokee have not shown, as a matter of law, that the Clean-Up Costs they claim to have incurred in connection with ASR's allegations of breach of the 1998 Remediation Agreement were required by "Environmental Laws" or governmental orders. First, there is a question whether Federal and Cherokee were "legally obligated" by statute or governmental order to pay expenses based on the "claims" brought by ASR. Federal and Cherokee argue that ASR's letters expressing dissatisfaction with the remediation project triggered a "legal obligation" to pay additional expenses for Clean-Up Costs to remediate the Site. However, the legal liability for the Site to be remediated pursuant to environmental laws (ECRA) or governmental orders (the ACO) was imposed not on Federal or Cherokee, but rather on ASR directly. Federal indeed assumed ASR's responsibility to remediate the Site under the 1996 Settlement Agreement; Cherokee assumed responsibility for the clean-up project under the 1998 Remediation Agreement. However, it appears that Federal and Cherokee's obligations to remediate the Site—which necessarily would include the incurring of various costs and expenses—were based on contractual agreements, rather than directly on environmental laws

(like ECRA) or governmental orders (like the ACO).  Indeed, the July 20 and August 25, 2006 Letters consistently refer to the 1996 Settlement Agreement between ASR and Federal, and claim that Federal had breached that <u>Agreement</u> with ASR due to its failures to properly remediate the Site.  July 20, 2006 Letter 3 ("[W]e are stating, for the record, that Federal has breached its obligations to ASR and that as a consequence, ASR has been damaged and continues to be damaged."); Aug. 25, 2006 Letter 2 ("Federal has breached the [1996] Settlement Agreement through its inaction and misfeasance, in addition Federal has triggered the provisions of the Settlement Agreement calling for indemnification of the other parties.").

The July 20, 2006 and Aug. 25, 2006 Letters also show that the NJDEP still held ASR directly liable for the remediation project, not Federal or Cherokee.[16]  July 20, 2006 Letter 1 ("[The NJDEP] has recently informed ASR that it is dissatisfied with the pace and progress of the investigation and remediation being conducted at the Site."); Aug. 25, 2006 Letter 1 ("[The NJDEP] is requiring the attendance of Mr. Strauss and Mr. Ghavami at any meeting with the DEP and is requiring that Mr. Strauss and Mr. Ghavami certify all future submittals by Federal's contractor to the DEP.").[17]  ASR expressed frustration at having to deal with complaints by the NJDEP concerning the failure of the Site to be properly remediated pursuant to the ACO.  <u>Id.</u>  In addition, Federal and Cherokee's contention that the Draft Complaint triggered a legal obligation to incur Clean-Up Costs is not dispositive since the Draft Complaint was never formally filed and Federal and ASR independently settled the matter.

---

[16]     Cherokee concedes that ASR, Strauss and Ghavami "were ultimately responsible to the NJDEP as the Ordered Parties under the ACO."  Br. of Def. Cherokee in Supp. of its Cross-Mot. for Summ. J. 8.
[17]     Federal and Cherokee have not provided any letters or other evidence which would show that the NJDEP held Federal and/or Cherokee directly liable for the remediation of the Site.

Furthermore, Federal and Cherokee have not shown on this motion that there are no issues of material fact whether the expenses for which they seek reimbursement were "unexpected and unintended," as is required under Coverage C.  PLL Policy § I.1.C.2. (requiring that Clean-Up Costs incurred pursuant to Environmental Laws be "unexpected and unintended from the standpoint of the **Insured**.").  It is disputed that the expenses arose from unanticipated pollutants found on the Site for which an Environmental Law, or government directive, mandated additional remediation.  For example, Federal was well-aware of the ACO and ECRA when it entered into the 1996 Settlement Agreement with ASR; Cherokee was also well-aware of the ACO and ECRA when it entered into the 1998 Remediation Agreement with Federal.  Both of the insured parties, therefore, were aware that they would have to incur various costs to remediate the Site pursuant to the ACO and the ECRA at the outset of the remediation project, and certainly in 2006 and 2007 when ASR issued its claims against Federal for breach of the 1996 Settlement Agreement.  If the 2006 Letters or the 2007 Draft Complaint had caused Federal or Cherokee to incur additional costs arising out of environmental laws or directives, Federal and Cherokee have not shown on this motion what these costs are and how they are "unexpected and unintended."  Therefore, whether the costs incurred in connection with the ASR claim are covered by the PLL Policy remains an issue of fact.

Ultimately, neither moving party has presented evidence as to the nature of the Costs.  It remains unknown whether Federal and/or Cherokee incurred the additional costs in compliance with the 1996 Settlement and 1998 Remediation Agreements or were "legally obligated" to pay for these costs "[t]o the extent required by **Environmental Laws**, or by governmental or court order of directive, or required by a governmental agency, acting under authority granted by **Environmental Laws**."  PLL Policy § VI.G.  Federal and Cherokee have also not shown

29

whether the additional costs were unexpected or unintended.  Therefore, Federal and Cherokee have not satisfied their respective burdens of showing that there is an absence of a question of fact as to whether the claims fall under the PLL Policy.

## 2. WAIVER AND ESTOPPEL

Federal and Cherokee argue that AISLIC accepted coverage of claims in December 2006, and thus waived the right to subsequently deny coverage of claims.  Specifically, Federal and Cherokee maintain that AISLIC's alleged acceptance of coverage under the PLL Policy on December 21, 2006—and allegedly unreasonably timed revocation of coverage on October 12, 2007—instilled a reasonable reliance in the insured parties that the claims would be covered. This reliance, they argue, bars the insurer from subsequently denying coverage.  Federal and Cherokee also contend that the delay in revoking the alleged acceptance estops AISLIC from denying coverage.

In support of its waiver argument, Federal and Cherokee rely on several cases for the general proposition that an acceptance of coverage may, in certain circumstances, constitute a waiver of the right to subsequently deny coverage of claims that would otherwise fall outside an insurance policy. See, e.g., Iafelice ex rel. Wright v. Arpino, 319 N.J. Super 581, 589 (App. Div. 1999) (holding that an insurer's inviting the insured party to make a proper payment on the insurance policy constituted a waiver of the right to deny coverage based on the initial payment error and estopped the insurer from denying coverage); Warren v. Employers' Fire Ins. Co., Boston, Mass., 53 N.J. 308, 311 (1969) (holding that an insurance company's admission of liability estopped them from raising as a defense that the claim fell outside the period of limitations).

However, the cases cited by Federal and Cherokee are distinguishable from the facts at hand because in the December 21, 2006 Letter, AISLIC specifically reserved its rights to disclaim coverage of Loss or Clean-Up Costs that fell outside the terms of the PLL Policy.  As noted <u>supra</u>, courts in this jurisdiction have held that an insurer's express reservation of its rights to deny coverage and assert all defenses prevents the application of waiver and estoppel which would bar the subsequent denial of coverage.  <u>Hatco</u>, 801 F. Supp. at 1363; <u>Shebar</u>, 111 N.J. at 291.  Indeed, on December 21, 2006, AISLIC sent a letter entitled "Acceptance of Defense" to Cherokee which purportedly accepted coverage under Coverage C of the PLL Policy (or other of the coverages for claims involving third-parties) for Clean-Up Costs Federal and Cherokee were to incur based on the claims of ASR.  Dec. 21, 2006 Letter 1 ("Based upon a review of the policy, as well as an examination of the facts and circumstances present to date, ASLIC [sic] accepts coverage of this claim under [the PLL Policy] subject to . . . a reservation of rights."). The letter explicitly and repeatedly iterated that "AISLIC reserves its rights to deny coverage for loss which does not arise out of the insured contract."  <u>Id.</u> at 3.  AISLIC also explicitly noted that this letter would not constitute a waiver or unconditional acceptance of coverage.[18]  <u>Id.</u> at 6. After concluding that the claims fell outside Coverages C through N of the PLL Policy, AISLIC sent a letter dated October 12, 2007 to Cherokee and Federal withdrawing the December 21, 2006 acceptance of coverage.  <u>See</u> Oct. 12, 2007 Letter.  Clearly, the inclusion of an express reservation of rights provision demonstrates that AISLIC did not intend to relinquish its rights

---

[18]      "AISLIC does not waive or surrender any of its rights under any of the terms, conditions, limitations and/or exclusions contained in any of the policies issued by AISLIC to the Cherokee Ardell, LLC.  AISLIC specifically reserves the right to assert a defense to coverage based upon any term, condition, provision or exclusion of the policies issued to the City and Cherokee Ardell, LLC.  Further, AISLIC specifically reserves the right to modify, amend or supplement the coverage position taken in this letter."  Dec. 21, 2006 Letter 6.

under the PLL Policy to subsequently deny coverage of claims that fell outside the policy's terms and conditions.  See Hatco 801 F. Supp. at 1363; Shebar, 111 N.J. at 291.

Accordingly this Court finds that AISLIC's express reservation of rights in the Dec. 21, 2006 Letter did not constitute a waiver of its right to subsequently deny coverage, and the motions by Federal and Cherokee for summary judgment on that basis must be denied.

With regard to the issue of estoppel, an insurer's unreasonable delay in asserting its right to deny a claim can estop the insurer from disclaiming coverage, even for a claim that would fall outside the policy.  Griggs, 88 N.J. at 357.  As mentioned, supra, an essential element for the application of estoppel is that the insured party reasonably relied to its own detriment on the actions of the insurer.  Messa v. Omaha Property & Cas. Ins. Co., 122 F. Supp. 2d 523, 532 (D.N.J. 2000); Barrett v. New Jersey Mfrs. Ins. Co., 295 N.J. Super. 613, 618 (App. Div. 1996); Miller v. Board of Trustees of Teachers' Pension & Annuity Fund, 179 N.J. Super. 473, 477 (App. Div. 1981); Eggleston, 37 N.J. at 129; Griggs, 88 N.J. at 358.

Federal and Cherokee argue that AISLIC's approximately ten-month delay in revoking coverage (December 21, 2006 to October 12, 2007) was unreasonable and compels the application of estoppel.  However, Federal and Cherokee fail to show how they relied to their detriment on AISLIC's acceptance of coverage in December 2006.  For example, in Reliance Ins. Co. v. Armstrong World Indus. Inc., the insurer acknowledged receipt of the insured's claim for coverage arising from a third-party complaint.  292 N.J. Super. 365, 374 (App. Div. 1996). While the insurer took nineteen months before denying coverage, the court found that estoppel would only apply if the insured party could make a prima facie showing that the delay resulted in prejudice.  Id. at 376.  Since the insured party could not show prejudicial reliance, the court rejected the estoppel argument.  Id.  Similarly, in Liberty Ins. Corp. v. Tinplate Purchasing

Corp., the insurer acknowledged receipt of claims for coverage, reserved the right to deny coverage, and nine months later, disclaimed coverage.  743 F. Supp. 2d 406, 417 (D.N.J. 2010). Despite the delay, the court found that estoppel would not apply because the insured party failed to show that it relied on any statements or actions of the insurer to its detriment: "The [insurer's] delay in making a coverage decision does not require that it be estopped from asserting exclusion defenses under the policies because the [insured] were not prejudiced thereby."  Id.; see also Hatco, 801 F. Supp. at 1363; compare Griggs, 88 N.J. at 362 (applying estoppel after finding that the insurer's delay resulted in prejudice to the insured).

Furthermore, courts have been hesitant to find reliance for purposes of estoppel where the insurer explicitly reserved its rights to subsequently disclaim coverage.  The Hatco court also denied the former owner's motion for summary judgment on the issue that the excess insurers of the property were estopped from raising a defense to coverage.  801 F. Supp. at 1362.  The former owner in that case argued that the insurers' failure to disclaim coverage following the two years of providing coverage constituted estoppel.  Id.  The court found that in the relevant insurance provision, the excess insurers expressly retained the right to disclaim defense and created no expectation otherwise and therefore, the two-year period was not an unreasonable delay. Id; see also National Grange Mut. Ins. Co. v. Stulb, No. 07-1234, 2008 WL 2025161, at *12 (D.N.J. May 8, 2008) (implying that the insured party could not assert that it detrimentally relied on insurer's representation that it would not void an insurance policy where the insurer expressly reserved the right to deny liability under the policy); Witco Corp. v. Travelers Indem. Co., No. 86-2997, 1987 WL 65060, at *9 (D.N.J. 1987) (denying summary judgment after finding that the insurer's assertion of a duty to defend the insured in an action brought by the

NJDEP to compel the insured to undertake environmental remediation as well as the insurer's express reservation of rights evince the insurer's intention to dispute coverage).

On their motion, Federal and Cherokee have not submitted any evidence of how, if at all, they relied on AISLIC's acceptance of coverage in the December 21, 2006 Letter to their detriment.  Moreover, Federal and Cherokee have failed to show reasonable reliance in light of AISLIC's explicit reservation of its rights to later deny coverage in the Letter.   Thus, summary judgement, based upon the doctrines of estoppel and waiver, must be denied with respect to AISLIC's denial of claim under the PPL Policy.

### 3. CHEROKEE'S CLAIMS FOR COVERAGE OF LEGAL FEES

Cherokee additionally contends that AISLIC is liable under the PLL Policy to reimburse Cherokee's legal fees in defending against Federal's claims in this lawsuit.  However, Coverages C and D of the PLL Policy do not apply to "**Claims** . . . by any **Insured** against any other person or entity who is also **Insured** under this Policy."  PLL Policy § IV.1.J.  Therefore, based on the clear language of the PLL Policy, Cherokee's motion for summary judgment that AISLIC is liable to cover Cherokee's legal fees in this lawsuit must be denied.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant AISLIC's motion for summary judgment on the Cost Cap Policy and DENIES the motions of Plaintiff Federal and Defendant Cherokee for summary judgment on the PLL Policy.

/s/ Freda L. Wolfson
United States District Judge

DATED: March 28, 2011